857 So.2d 845 (2003)
Anthony A. SPANN, Appellant,
v.
STATE of Florida, Appellee.
No. SC00-1498.
Supreme Court of Florida.
April 3, 2003.
Rehearing Denied October 16, 2003.
*849 Robert A. Norgard, Special Public Defender, Bartow, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Melanie A. Dale, Assistant Attorney General, West Palm Beach, FL, for Appellee.
PER CURIAM.
We have on appeal a judgment for first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm both the conviction for first-degree murder and the sentence of death.

Factual and Procedural History
On November 13, 1997, Anthony Spann (Spann) drove his blue Subaru as the getaway car for the robbery of a pawn shop. Leonard Philmore (Philmore) and Sophia Hutchins (Hutchins) robbed the pawn shop. They took handguns and jewelry, but little or no money. That evening, Spann, Philmore, and two women, Keyontra Cooper (Cooper) and Toya Stevenson (Stevenson), spent the night in a local motel.
The next morning, on November 14, 1997, while the four were still at the motel, Cooper's friend paged her to tell her that police were looking for Philmore. Spann and Philmore decided to leave town and planned to rob a bank for the money to do so. They planned to use the Subaru as the getaway car from the bank robbery. Since they assumed police would be looking for the Subaru, they planned to carjack a different vehicle to use as transportation to leave town. They specifically targeted a woman for the carjacking to make it easier, and then planned to kill her so that she could not identify them later.
At about noon, Spann and Philmore took Cooper and Stevenson home to get ready to leave town. Spann and Philmore then went to a shopping mall to search for a victim. When their attempts failed, they went to what Spann described as "a nice neighborhood" where they spotted a gold Lexus with a woman driver. They followed her to a residence. When she pulled into the driveway, Philmore approached her, asked to use her cell phone, then forced her back into the car at gunpoint.
Philmore rode in the Lexus with the victim, Kazue Perron, and Spann followed in the Subaru. The victim was nervous and crying. She offered Philmore her jewelry, which he took and then later threw away because he was afraid it would get him in trouble. They drove down an isolated road, and when they stopped, Spann motioned to Philmore, a motion which Philmore understood to mean that he should kill the woman. Philmore told the victim to go to the edge of a canal, but according to him, the woman instead came toward him. Philmore testified that he shot her in the forehead using a gun he had stolen the day before from the pawn shop. Philmore picked up the victim's body and threw it into the canal, and got blood on his shirt.
Philmore and Spann left together in the Subaru to rob a bank. In the car, Philmore took off his bloody t-shirt, which was later recovered by police, and put on Spann's t-shirt. Philmore went into the bank, grabbed approximately one thousand dollars cash from the hand of a customer at the counter, and got back into the passenger's side of the blue Subaru. As planned, Spann and Philmore abandoned the Subaru and picked up the Lexus. They then went to pick up Cooper and Stevenson.
Stevenson testified that between 2:30 and 3:00 that afternoon, Spann and Philmore *850 picked her up in the Lexus. They picked up Cooper, then headed back to Sophia Hutchins' house. Stevenson and Cooper questioned Philmore and Spann about the car and they were told not to worry about it.
Before they reached Hutchins' house, at around 3:15 p.m., Officer Willie Smith, who was working undercover for the West Palm Beach Police Department, saw Spann driving the gold Lexus. Smith knew Spann had an outstanding warrant so he signaled surveillance officers, who began to pursue him. Spann tried to outdrive the police and a chase began at speeds of up to 130 miles per hour through a residential neighborhood. They drove onto the interstate, and the police lost Spann. Eventually the Lexus blew a tire and went off the road at the county line. A motorcyclist saw the Lexus drive off the road and four people get out and run into an orange grove. The motorcyclist called 911 on his cell phone.
The grove owner was working with a hired hand that day trapping hogs in the grove. He saw people come into the grove from the road and later identified one of the men as Spann. The grove owner heard a helicopter overhead and saw that the men had guns. He told them to hide in the creek brush, then he called 911. The grove owner met troopers by the road and helped search for Spann and the others. Six hours after the manhunt began, Spann, Philmore, Cooper and Stevenson were found in the grove. Days later, the grove owner found a gun and beeper in the water near the creek brush where the four were hiding. Police recovered a second gun in the same water.
Spann and Philmore were both indicted on the charge of first-degree murder, but their trials were severed. Spann was also indicted for the crimes of conspiracy to commit robbery with a deadly weapon, carjacking with a deadly weapon, kidnapping, robbery with a deadly weapon, and grand theft. Philmore was tried first and convicted of first-degree murder. See Philmore v. State, 820 So.2d 919 (Fla. 2002), cert. denied, 537 U.S. 895, 123 S.Ct. 179, 154 L.Ed.2d 162 (2002). Before his sentencing phase trial, Philmore testified for the State against Spann. Philmore was eventually sentenced to death and the conviction and sentence were affirmed on appeal. See id.
As for Spann, the jury returned verdicts of guilty on each count, including the first-degree murder of Kazue Perron. Spann waived both the presentation of mitigating evidence and a jury advisory recommendation. The trial court conducted hearings on these matters, found that Spann's decision was made knowingly and intelligently, and discharged the jury. Defense counsel proffered evidence in mitigation, and the State presented three witnesses in support of certain aggravating circumstances. The parties filed sentencing memoranda, and the trial court conducted a Spencer[1] hearing. The trial court then sentenced Spann to death for first-degree murder; fifteen years for conspiracy to commit robbery with a deadly weapon; life for carjacking; life for kidnapping; life for robbery with a deadly weapon; and five years for grand theft. Spann now appeals, raising seven issues not including our required proportionality review. The issues are restated as follows: (1) whether the trial court erred in admitting expert testimony as to handwriting identification because the expert testimony does not satisfy the test set forth in Frye v. United States, 293 F. 1013 (D.C.Cir.1923); (2) whether the trial court *851 failed to adequately follow the procedures required for granting a defendant's request to waive mitigation as set forth in Koon v. Dugger, 619 So.2d 246 (Fla.1993); (3) whether the trial court erroneously found that Spann freely and voluntarily made a knowing and intelligent waiver of the advisory jury in the penalty phase trial; (4) whether the trial court improperly found and considered Spann's conviction for misdemeanor battery as an aggravating factor; (5) whether the trial court improperly doubled three separate aggravating circumstances; (6) whether the trial court failed to consider and weigh all the mitigating evidence in the record; (7) whether the trial court abused its discretion in the weight assigned to the mitigating factors; and (8) although not raised by Spann, whether the sentence of death was proportional. We discuss each issue below.

Discussion

1. Frye Issue
While in jail, Spann wrote Philmore a note telling Philmore how he should testify. Spann initially denied writing the note. He eventually admitted he wrote it after handwriting experts were hired and Spann was ordered to give handwriting samples, which he did. Although Spann admitted writing the note, the State still wanted its handwriting expert to testify at trial that Spann distorted or intentionally disguised his handwriting samples, arguing that this showed consciousness of guilt. Defense counsel moved to exclude the State's handwriting expert's testimony to the extent the expert's testimony was irrelevant and inadmissible under Frye or Daubert,[2] and argued that expert testimony on the distortion issue had not been determined to be scientifically accepted. The trial court set a Frye hearing on this limited issue.
At the Frye hearing, the trial court inquired at length regarding the disguise or distortion issue, and limited its consideration to whether the testimony was a proper topic for expert opinion and whether its probative value outweighed its prejudicial effect. The trial court found that the proffered testimony would "assist the jury in determining the fact in issue," that the proffered testimony "is indeed based on scientific principle, which has gained acceptance in the field of Forensic Document Examination," and that the "witness is qualified as an expert to present opinion testimony on the variations of the Defendant's handwriting and possible basis for it." The court ordered that no mention be made at trial that the writing samples Spann provided were the result of a court order. Although the trial court permitted the expert to testify as to the differences in the handwriting samples and possible reasons for it, such as intoxication, illness, or physical impairment, the court prohibited the expert from specifically rendering an opinion of intentional disguise, or that Spann had a deliberate intent to deceive or disguise his handwriting. Defense counsel registered an objection, but did not contemporaneously provide a specific basis for the objection.
The record clearly demonstrates Spann's objection at trial was supported by the argument that the expert should not be permitted to testify that Spann distorted or disguised his handwriting. However, that is not the issue raised in this appeal.
In this appeal, Spann argues that the admissibility of handwriting comparison *852 testimony in general should be reconsidered since this type of testimony has recently been scrutinized in the federal courts under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Spann's argument is beyond the scope of the very clear objection at trial. To be preserved for appeal, "the specific legal ground upon which a claim is based must be raised at trial and a claim different than that will not be heard on appeal." Rodriguez v. State, 609 So.2d 493, 499 (Fla.1992). Because the record clearly shows that Spann's trial objection was limited to the expert testimony on the issue of distortion or intentional disguise, and because Spann's argument here is that handwriting expert testimony in general should be barred, the issue was not properly preserved and this claim is procedurally barred.
Even if the alleged error had been properly preserved, this claim would fail. All of the cases cited by Spann involve the federal standard for admitting new or novel scientific evidence under the test set forth in Daubert. Florida does not follow Daubert. Florida courts follow the test set out in Frye v. United States, 293 F. 1013 (D.C.Cir.1923). "This test requires that the scientific principles undergirding this evidence be found by the trial court to be generally accepted by the relevant members of its particular field." Hadden v. State, 690 So.2d 573, 576 (Fla. 1997). Courts will only utilize the Frye test in cases of new and novel scientific evidence. See, e.g., U.S. Sugar Corp. v. Henson, 823 So.2d 104 (Fla.2002); Brim v. State, 695 So.2d 268, 271-72 (Fla.1997). "By definition, the Frye standard only applies when an expert attempts to render an opinion that is based upon new or novel scientific techniques." U.S. Sugar, 823 So.2d at 109 (citing Ramirez v. State, 651 So.2d 1164, 1166-67 (Fla.1995)). In the vast majority of cases, no Frye inquiry will be required because no innovative scientific theories will be at issue.
Forensic handwriting identification is not a new or novel science. In fact, by the turn of the century expert testimony in the area of handwriting identification was permitted in thirty-seven states and "was viewed as the obvious and necessary way to adduce proof about the authenticity of disputed writings." Jennifer L. Mnookin, Scripting Expertise: The History of Handwriting Identification Evidence and the Judicial Construction of Reliability, 87 Va. L.Rev. 1723, 1756 (2001). Frye was decided in 1923, and by that time, forensic handwriting identification had already established itself as a tool commonly used in court. Once established, handwriting identification experts were unchallenged as valid and acceptable experts for the majority of the twentieth century. In 1993, the United States Supreme Court decided Daubert, which interprets a federal rule of evidence and is not binding on the states. Daubert requires the trial judge to evaluate scientific expert testimony to ensure that the "reasoning or methodology underlying the testimony is scientifically valid" before admitting it. Id. at 592-93, 113 S.Ct. 2786. Following Daubert, some federal courts have reexamined the admissibility of handwriting expert testimony, and those are the cases Spann relies on here to support his contention that we should also reexamine the admissibility of expert handwriting identification testimony. See, e.g., United States v. Starzecpyzel, 880 F.Supp. 1027, 1048 (S.D.N.Y.1995) (holding that a document examiner's testimony could not survive scrutiny under Daubert, but expert handwriting examiners, while not scientific enough to satisfy Daubert, could be admitted as "nonscientific expert witnesses" who "provid[e] jurors with a *853 helpful practical skill derived from their training and experience").
While some federal courts have affirmed the use of handwriting identification experts under Daubert and some have not, Florida still considers the admissibility of new and novel scientific evidence under the test set forth in Frye. Because expert forensic handwriting identification is not new or novel, Frye has no application. Therefore, even if the issue Spann raises here had been properly preserved for review, it would be without merit. The Frye hearing in this case was limited to the issue of whether the expert could testify that Spann distorted or disguised his handwriting. The trial court properly admitted the testimony.
Because Spann did not properly preserve the issue of whether the field of expert handwriting identification in general meets the Frye test, this issue is procedurally barred. Furthermore, the trial court's consideration of the admissibility of expert testimony on the limited issue of distorted or disguised handwriting was properly considered and resolved. Therefore, Spann is not entitled to relief on this claim.

2. Waiver of Mitigating Evidence
It is well established that a competent defendant may waive his right to present mitigating evidence in the penalty phase of his first-degree murder trial. See Durocher v. State, 604 So.2d 810, 812 (Fla. 1992); Pettit v. State, 591 So.2d 618, 620 (Fla.1992) (holding that one convicted of first-degree murder could waive his right to present mitigating evidence, but stressing that "the trial judge must carefully analyze the possible statutory and nonstatutory mitigating factors against the aggravators to assure that death is appropriate").
Before the trial court may grant a defendant's request to waive the presentation of mitigation, the court is obligated to ensure that the defendant's waiver is knowing, uncoerced, and not due to defense counsel's failure to fully investigate penalty phase matters. See Koon v. Dugger, 619 So.2d 246, 250 (Fla.1993). As Koon states, when a defendant refuses to allow the presentation of mitigating evidence in the penalty phase against his counsel's advice, (1) counsel must inform the court on the record of the defendant's decision; (2) counsel must indicate whether, based on his investigation, he reasonably believes there to be mitigating evidence that could be presented and what that evidence would be; and (3) the trial court should then require the defendant to confirm on the record that his counsel has discussed these matters with him, and despite counsel's recommendation, he wishes to waive presentation of penalty phase evidence. See id. at 250. Application of this rule creates a trial record that adequately reflects the defendant's knowing waiver of his right to present evidence in mitigation. See id. at 249. The procedures set forth in Koon were followed in this case.
Defense counsel notified the court on the record that Spann did not wish to present mitigating evidence. Spann told the court that he had been thinking about this decision since he was in jail in 1997. On two separate occasionsat the time Spann waived his presentation of mitigation and again when he waived a jury at the penalty phasethe trial judge inquired in detail, and defense counsel indicated on the record what the mitigating evidence would be if it were presented. The court inquired whether Spann's decision was against the advice of counsel, and counsel said it was. The court inquired directly of Spann whether he wished to waive mitigation and whether he understood the consequences of a waiver. The defense also *854 submitted a written sentencing memorandum, and the court ordered a presentence investigation. The judge heard penalty phase arguments and conducted a Spencer hearing. During the proceedings, Spann maintained his position that he did not wish to be present for the penalty phase and did not wish to present mitigation or even to have a penalty phase jury.
At the penalty phase trial, the State called three witnesses who testified to facts in support of aggravating circumstances. At sentencing, the court indicated that it considered the presentence investigation (PSI) and the sentencing scoresheet, as well as statutory and nonstatutory mitigators since the trial court must consider all mitigation anywhere in the record to the extent it is believable and uncontroverted even when a defendant waives the presentation of mitigating evidence. See Overton v. State, 801 So.2d 877 (Fla.2001) (citing Farr v. State, 621 So.2d 1368, 1369 (Fla.1993)).
Although the colloquy and repeated questioning of Spann is almost identical to the colloquy in Overton, which was found to be sufficient, Spann argues that his counsel did not thoroughly indicate the mitigation that existed in the record. The trial court solicited both statutory and nonstatutory mitigating evidence from defense counsel. Defense counsel advised the court that Spann was an accomplice with a relatively minor role in the murder, that Spann's mother, sister, and brother would testify that Spann was a good son and brother when he was a young man, and that at some point, Spann fell in with a bad crowd. Counsel also submitted that prison records show that Spann would be capable of living in an open prison environment without being a threat to himself or anyone else. Counsel indicated that a mental health expert was hired to examine Spann, but Spann failed to cooperate. The trial court questioned counsel as to what evidence they sought to present as a result of the mental health evaluation. Counsel also stated that they examined school records, social records, and criminal records, and that they met with Spann's family. The trial court specifically inquired about potential mitigating evidence discovered after meeting with Spann's family members. The trial court acted cautiously, followed the requirements of Koon, and conducted a colloquy similar to that in Overton, which was approved by this Court. The trial court did not abuse its discretion when it granted Spann's request to waive presentation of mitigation. "Discretion is abused only when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable [person] would take the view adopted by the trial court.'" Trease v. State, 768 So.2d 1050, 1053 n. 2 (Fla.2000) (quoting Huff v. State, 569 So.2d 1247, 1249 (Fla.1990)). The record supports the trial court's finding that Spann acted knowingly and intelligently when he waived presentation of mitigation, and that he did so on his own accord and not because his counsel failed to adequately investigate existing or available mitigation. Because there was no abuse of discretion, relief is hereby denied.

3. Waiver of Jury Recommendation
Spann argues that the judge erroneously found that he knowingly and intelligently waived a jury recommendation in the penalty phase trial because the judge treated the request as a matter of right rather than as a request that could be denied.
This Court recently considered the issue of voluntariness of a waiver in Griffin v. State, 820 So.2d 906 (Fla.2002). As in this case, the defendant in Griffin *855 waived his sentencing phase jury. We stated in Griffin that the standard by which this Court will consider the voluntariness of a waiver is similar to the one used when it considers the validity of a plea. Griffin, 820 So.2d at 912 (citing Lamadline v. State, 303 So.2d 17, 20 (Fla. 1974)). "[I]n order to challenge the voluntariness of a plea on appeal, the defendant first [must] move to withdraw the plea at the trial court." Id. at 912-913.
In this case, there was no motion to withdraw Spann's waiver of the sentencing phase jury. Therefore, under Griffin, Spann is foreclosed from raising this claim in this proceeding and may only raise the claim by collateral attack through a postconviction motion. See Griffin, 820 So.2d at 913 ("[F]ailure of a capital defendant to first attack the voluntariness of a waiver of a sentencing jury at the trial court precludes review on direct appeal."). We therefore deny relief on this claim.

4. Misdemeanor Battery in Support of an Aggravating Factor
Spann next argues that the trial court improperly found that he was previously convicted of another capital felony or another felony involving the use or threat of violence to the person. See § 921.141(5)(b), Fla. Stat. (1999). The "finding of a prior violent felony conviction aggravator only attaches `to life-threatening crimes in which the perpetrator comes in direct contact with a human victim.'" Mahn v. State, 714 So.2d 391, 399 (Fla. 1998) (quoting Lewis v. State, 398 So.2d 432, 438 (Fla.1981)). Whether a crime constitutes a prior violent felony is determined by the surrounding facts and circumstances of the prior crime. See Gore v. State, 706 So.2d 1328, 1333 (Fla.1997).
The trial court found that Spann was convicted in 1991 of the crime of battery, in 1995 of the crime of shooting into an occupied vehicle, and in 1999 of manslaughter with a firearm. Based upon judgments and sentences introduced as to "each offense," the court specifically stated in its sentencing order that "these felonies involve the use or threat of violence to another person." It is clear from the sentencing order that the trial court listed these three prior offenses in discussing the aggravating circumstance.
The State presented testimony from the driver of the vehicle into which Spann shot several times, as well as the judgment and sentence. The State also presented testimony from the homicide investigator who testified that Spann shot a man in 1997, and subsequently pleaded guilty to manslaughter. Either one of these crimes alone would support the finding of this aggravating circumstance. If there was any error in relying on the prior crime of battery to support this aggravating circumstance, it was harmless since Spann had two other prior felony convictions involving the use of violence to another person. See, e.g., Mahn v. State, 714 So.2d 391, 399 (Fla.1998) (concluding that although robbery conviction was improperly used as a prior violent felony conviction, contemporaneous convictions of two other homicides satisfied the aggravating circumstance).
Spann argues that this Court cannot consider the other two prior violent felonies because the trial court failed to provide the weight it attached to each of the prior felonies. Although the trial court did not specifically indicate the weight given to the battery conviction, it is clear from a close reading of the sentencing order, especially that portion discussing the first nonstatutory mitigating factor, that the battery conviction was given only some weight. The trial court considered the fact that the defendant was a juvenile when the battery incident occurred and *856 found this to be a mitigating factor. Relief is not warranted on this issue.

5. Improper Doubling
Spann argues that the trial court improperly doubled three aggravators: during the commission of a felony, pecuniary gain, and avoid arrest. The State counters that this issue was not properly preserved and that all three aggravators are based on different aspects of the crime so they should not be merged.
To be preserved for appeal, "the specific ground upon which a claim is based must be raised at trial and a claim different than that will not be heard on appeal." Rodriguez v. State, 609 So.2d 493, 499 (Fla.1992). Spann's argument was not preserved, but he contends that his failure to object does not preclude appellate review since the trial court may not double the aggravators.
Spann is correct that the consideration of two or more aggravators is improper when the aggravators are based on the same aspect of the crime. See Rose v. State, 787 So.2d 786, 801 (Fla.2001) (citing Banks v. State, 700 So.2d 363, 367 (Fla.1997)). However, the facts of a case may support multiple aggravating factors "so long as they are separate and distinct aggravators and not merely restatements of each other." Rose, 787 So.2d. at 801. This Court in Banks said:
Improper doubling occurs when both aggravators rely on the same essential feature or aspect of the crime. However, there is no reason why the facts in a given case may not support multiple aggravating factors so long as they are separate and distinct aggravators and not merely restatements of each other, as in murder committed during a burglary or robbery and murder for pecuniary gain, or murder committed to avoid arrest and murder committed to hinder law enforcement.
700 So.2d at 367 (citation omitted). Therefore, when considering the issue of doubling, the focus is on the aggravators themselves, not on the overlapping facts.
The trial court relied on the following facts to support the aggravating circumstance of kidnapping the victim of the homicide. Spann and Philmore planned to rob a bank because they did not get enough money from the robbery of a pawn shop the previous day. They planned to carjack a vehicle, abduct the woman driver, and then kill her so she could not identify them. The evidence shows that Spann and Philmore did exactly what they had planned. They followed the victim, Kazue Perron, to her residence, approached her as she was getting out of her vehicle, and forced her back into the car at gun point. Perron was forced to drive toward Indiantown. They eventually drove down an isolated road, where Perron was killed. These facts clearly demonstrate that the murder was committed during a kidnapping.
In support of the pecuniary gain aggravator, the trial court considered the facts which demonstrated that during the series of events, Spann and Philmore stole the vehicle the murder victim had been driving. After Perron was forced to drive to an isolated location, the defendants took her vehicle. After they snatched $1000 from a customer in a bank, Spann and Philmore used Perron's Lexus to pick up their female companions. They were in the Lexus when they were spotted by the police. The murder was in fact committed for pecuniary gain of the vehicle.
The testimony is clear that Spann told Philmore they needed to kill the victim of the carjacking so that she could not identify them and they would have enough time to get away with the car. The evidence was unrebutted that the elimination of the *857 witness was the dominant motive for the murder. The victim's body was found in a remote area, and she was shot in the forehead, which is consistent with an execution-style killing. Philmore, who was also found guilty of first-degree murder and sentenced to death, also challenged the avoid arrest aggravator. Based on the same evidence, this Court upheld the trial court's finding that the sole or dominant motive for the killing was to eliminate the witness. See Philmore v. State, 820 So.2d 919, 935 (Fla.2002) (finding competent, substantial evidence of witness elimination existed where the defendant confessed that he killed the victim to eliminate her as a witness; he drove the victim for approximately thirty minutes looking for a remote location; and there was no indication that the defendant wore a mask or gloves to conceal his identity).
It is clear that the facts in support of these three aggravating factors overlap. However, Banks does not prohibit the use of the same facts to support multiple aggravating factors so long as they are separate and distinct aggravators and not merely restatements of each other.
We have previously upheld the finding of the "pecuniary gain and committed during the course of a kidnaping" aggravators. See Hartley v. State, 686 So.2d 1316, 1323 (Fla.1996) (noting that the assertion that the pecuniary gain and in-the-course-of-a-kidnapping aggravators are improperly doubled has been consistently rejected). Where other factors indicate that the defendant did not act with the absolute, sole motive of pecuniary gain, it is not error to find the pecuniary gain and in-the-course-of-a-kidnaping aggravators. Id. Spann's sole motivation for these crimes was not pecuniary gain; he clearly wanted the victim dead to prevent her from identifying him. Therefore, these two aggravators were properly found.
We also reject the argument that the pecuniary gain aggravator is inconsistent with a concurrent finding of the avoid arrest aggravator. See Thompson v. State, 648 So.2d 692, 695 (Fla.1994) (holding that it is proper for a trial court to utilize both the pecuniary gain and avoid arrest aggravators in the same case); see also Hildwin v. State, 727 So.2d 193, 195 (Fla.1998) (holding "in order to establish this aggravator the State must prove beyond a reasonable doubt only that `the murder was motivated, at least in part, by a desire to obtain money, property or other financial gain'") (quoting Finney v. State, 660 So.2d 674, 680 (Fla.1995)). The evidence is clear that the murder was motivated by Spann and Philmore's desire to obtain a car so they could leave town in an unsuspicious car after they robbed a bank.
The three aggravators are based on separate and distinct aspects of the criminal enterprise and were properly found. Therefore, relief on this claim is denied.

6. Consideration of All Mitigating Evidence
Mitigating evidence must be considered and weighed when it is contained anywhere in the record, to the extent it is uncontroverted and believable. See Farr v. State, 621 So.2d 1368 (Fla. 1993). This requirement applies with equal force when the defendant asks the court not to consider mitigating evidence, as Spann did in this case. Id. The sentencing court must "expressly evaluate in its written order each mitigating circumstance proposed by the defendant." Rogers v. State, 783 So.2d 980, 995 (Fla.2001); accord Jackson v. State, 767 So.2d 1156, 1158 (Fla.2000). "Such documentation is necessary to assure this Court that the trial court has properly evaluated and weighed each mitigating circumstance proposed by the defendant, as well as to permit this Court a meaningful review of the *858 sentencing order." Bryant v. State, 785 So.2d 422, 432-33 (Fla.2001); Jackson, 767 So.2d at 1159. However, because nonstatutory mitigation is so individualized, the defense must share the burden and identify for the court the specific nonstatutory mitigation it is attempting to establish. See Lucas v. State, 568 So.2d 18, 24 (Fla. 1990); see also Donaldson v. State, 722 So.2d 177, 188 (Fla.1998).
Spann claims there are nineteen items of mitigation supported by the record that are believable and uncontroverted, including: (1) Spann was capable of living in a prison population without serious difficulty or doing harm to another; (2) at a certain age Spann came under the influence of a bad crowd; (3) available mental health mitigation; (4) school records; (5) social records; (6) Spann's criminal history records; (7) Philmore's criminal history records; (8) Spann was in a car accident in 1989 or 1990; (9) Spann's drug use during the episode; (10) Spann's low level of education as referenced in the PSI; (11) Spann's skills as a welder; (12) Spann's current or most recent employer is unknown; (13) Spann left home at an early age; (14) Spann had an unstable residential history; (15) Spann has two other children besides the one referenced in the sentencing order; (16) Spann has sinus and hayfever problems; (17) Spann has an unhealthy relationship with his mother; (18) Spann needed an appropriate male role model; and (19) Spann was institutionalized as a juvenile.
In the sentencing order, the trial court stated:
The defendant has affirmatively waived all evidence of mitigation, hence none was presented. However, the Court will consider the proffered non-statutory mitigation as well as all mitigation in the record including any and all mitigation as set forth in the PSI.
The trial court then considered and weighed the mitigating evidence that was established in the record. The trial court found no statutory mitigation but specifically found the following nonstatutory mitigation: (1) the defendant had been a good son according to his mother, a good brother according to his siblings, and a good student up to a point (little weight); (2) the defendant was not the person who fired the fatal shots in the murder for which he is to be sentenced (very little weight); (3) the defendant is capable of living in a prison population without serious difficulty or doing harm to another (some weight); (4) the defendant's wife would testify that he was a good husband and father (slight weight); and (5) the PSI reflects that the defendant's father was shot to death when the defendant was two to four years old (moderate weight).
The trial court concluded:
The Court accepted as true through the proffer and/or through the evidence and/or PSI that non-statutory mitigating circumstances have been established, as discussed above.
Spann argues that all mitigating evidence, even if it was not explicitly proffered but contained somewhere in the record, should have been individually listed in the sentencing order and discussed. Evidence is mitigating if, in fairness or in the totality of the defendant's life or character, it may be considered as extenuating or reducing the degree of moral culpability for the crime committed. See Evans v. State, 808 So.2d 92 (Fla.2001). The relevant standards of review for mitigating circumstances are as follows: (1) whether a particular circumstance is truly mitigating in nature is a question of law and subject to de novo review by this Court; (2) whether a mitigating circumstance has been established by the evidence in a given case is a question of fact and subject to the *859 competent, substantial evidence standard; and (3) the weight assigned to a mitigating circumstance is within the trial court's discretion and subject to the abuse of discretion standard. See Campbell v. State, 571 So.2d 415, 419-20 (Fla.1990).
Many of the items Spann now lists as mitigation were considered by the trial court and were included in the trial court's discussion of mitigation in the sentencing order. For example, the sentencing court found that Spann was capable of living in a prison population without serious difficulty, and gave this nonstatutory mitigator some weight. The sentencing court also discussed Spann's assertion that at some point he came under the influence of a bad crowd. The sentencing court referenced the presentence investigation report, which would have included facts such as Spann's low level of education. Furthermore, the transcript indicates that the judge specifically inquired about Spann's school records, social records, and criminal history records, as well as any mitigation that would be revealed through a mental health evaluation. Other items Spann now lists as mitigation are not extenuating or do not reduce the degree of moral culpability for the crimes committed. For example, the evidence fails to show that Spann's alleged history of sinus and hayfever problems is mitigating. Likewise, Spann's skills as a welder, the fact that he left home at an early age, and his unstable residential history are not extenuating and do not reduce the degree of moral culpability for the crime committed. We find that the mitigating evidence was properly considered and weighed by the trial court, and we therefore deny relief on this issue.

7. Weighing of All Mitigating Evidence in the Record
Spann waived the presentation of mitigation, argued that the trial court did not consider all of the mitigation, and now argues that the mitigation the court did consider and found to exist was not given sufficient weight. The "weight assigned to a mitigating circumstance is within the trial court's discretion and subject to the abuse of discretion standard." Elledge v. State, 706 So.2d 1340, 1347 (Fla. 1997) (finding trial court did not abuse its discretion in providing weight to the mitigating circumstances because the Court could not "say that no reasonable person would give this circumstance [little] weight in the calculus of this crime"); accord Huff v. State, 569 So.2d 1247, 1249 (Fla.1990) ("[D]iscretion is abused only where no reasonable man would take the view adopted by the trial court.").
Spann argues that the trial court abused its discretion in assigning weight to three of the mitigating circumstances: that Spann was a good son, good brother, and good student (little weight); that Spann had a good jail record (some weight); and that Spann was a good husband and father (slight weight).
As stated above, it is well-settled law that it is within the discretion of the sentencing court to assign relative weight to each mitigating factor, and the sentencing court's finding will not be disturbed absent a showing of abuse of discretion. See Trease v. State, 768 So.2d 1050, 1055 (Fla. 2000); see also Elledge v. State, 706 So.2d 1340, 1347 (Fla.1997). In this case, the trial court evaluated the nonstatutory mitigation based on the information available in the record. If there was other information the trial court could have used to evaluate a potential mitigating factor, the defendant refused to present it. Cf. LaMarca v. State, 785 So.2d 1209, 1216 (Fla. 2001) ("Because appellant waived the presentation of mitigating evidence, he cannot subsequently complain on appeal that the trial court erred in declining to find mitigating circumstances that might otherwise *860 have been found....") It is illogical to accept the defendant's argument on appeal that a mitigating factor should have been found or greater weight should have been assigned based on evidence the defendant failed or refused to submit. Spann tied the hands of his trial counsel by refusing to allow any evidence in mitigation, and now argues the trial court should have sought a more detailed proffer concerning mitigation. The trial court did not abuse its discretion. Thus, this claim does not warrant a new penalty phase trial.

8. Proportionality Review
Finally, we find that the sentence of death in this case is proportional. The trial court properly found five aggravating circumstances: (1) prior violent felony; (2) felony murder (kidnapping); (3) avoid arrest; (4) pecuniary gain; and (5) cold, calculated and premeditated (CCP). No statutory mitigators were found. The nonstatutory mitigators that were found are: (1) Spann was relatively young at the time of the battery conviction (some weight); (2) Spann was a good son, good brother, and good student (little weight); (3) Spann was not the shooter (very little weight); (4) Spann had a good jail record (some weight); (5) Spann was a good husband and father (slight weight); (6) Spann's father had been shot to death (moderate weight).
The sentence of death is proportional to other death sentences where there were findings of similar factors in aggravation and mitigation. See Cave v. State, 727 So.2d 227, 229 (Fla.1998) (affirming death sentence with murder in the course of a felony (robbery-kidnapping), CCP, HAC, and avoid arrest aggravators and one statutory and eight nonstatutory mitigators where the defendant was the ring leader of a plan to rob a convenience store, led the victim at gunpoint, and controlled her during the long ride to a remote location where she was killed by accomplices); Alston v. State, 723 So.2d 148 (Fla.1998) (upholding sentence of death where defendant and another man abducted the victim and shot him to death; finding five aggravating factorsprior violent felony, murder committed during a robbery and kidnaping, avoiding arrest, HAC, and CCP and several mitigating factors, including deprived and violent childhood, cooperation with police, low intelligence and mental age, bipolar disorder, and ability to get along with other people); Jennings v. State, 718 So.2d 144 (Fla.1998) (upholding death sentence where defendant killed three Cracker Barrel employees during a robbery by slitting their throats and trial court found three aggravating factors murder committed during the course of a robbery, murder committed to avoid arrest and CCPand several mitigating factors including no significant history of criminal behavior, deprived childhood, accomplice received a life sentence, cooperation with police, good employment history, loving relationship with mother, positive personality traits, capacity to care for and be loved by children, and exemplary courtroom behavior); Puiatti v. State, 495 So.2d 128, 129 (Fla.1986) (concluding that death sentence was proportional with avoid arrest, pecuniary gain, and CCP, no mitigation, and where codefendant kidnapped and robbed victim, used the victim's car to take her to orange grove where she was shot, and then drove to New Jersey). Thus, we conclude that the death sentence in this case was proportional.

Conclusion
For the reasons set forth above, we affirm the defendant's conviction of first-degree murder and his sentence of death.
It is so ordered.
ANSTEAD, C.J., WELLS, PARIENTE, and QUINCE, JJ., and SHAW and HARDING, Senior Justices, concur.
*861 LEWIS, J., concurs as to the conviction and concurs in result only as to the sentence.
NOTES
[1] Spencer v. State, 615 So.2d 688 (Fla. 1993). At a Spencer hearing the defendant is allowed to present additional mitigating evidence to the trial judge.
[2] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).